**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**CASEY LYNN LEWIS,**

      **Plaintiff,**

**v.**                              **Case No.: 3:14-cv-11796**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## <u>MEMORANDUM OPINION</u>

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 4, 6). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.    <u>Procedural History</u>

Plaintiff, Casey Lynn Lewis ("Claimant"), filed for DIB and SSI on May 16, 2011, alleging a disability onset date of August 1, 2009, (Tr. at 162, 168), due to "COPD [chronic

obstructive pulmonary disease], bipolar condition, thyroid condition, alcoholic ... severe depression ... severe anxiety." (Tr. at 198). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 11). Claimant filed a request for a hearing, which was held on October 12, 2012 before the Honorable Michele M. Kelley, Administrative Law Judge ("ALJ"). (Tr. at 29-81). By written decision dated October 31, 2012, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-23). The ALJ's decision became the final decision of the Commissioner on January 3, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On March 6, 2014, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Proceedings on May 23, 2014. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 12). Accordingly, this matter is ready for disposition.

## II.   Claimant's Background

Claimant was 46 years old at the time of her alleged onset of disability, 48 years old when she filed the applications for benefits, and 50 years old at the time of the ALJ's decision. (Tr. at 34). She is a high school graduate and completed one year of college. (Tr. at 199). Claimant communicates in English. (Tr. at 197). Her prior work experience includes jobs as a telemarketer, customer service representative for a telemarketing company, retail cashier, auditor, video store manager, insurance and benefits clerk, and waitress. (Tr. at 21).

## III.   Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A

disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the

Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the

criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through June 30, 2013. (Tr. at 13, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since August 1, 2009, the alleged disability onset date. (*Id.*, Finding No. 2). Claimant had several short-term jobs between April 2010 and January 2011, but the ALJ found these jobs to constitute unsuccessful work attempts, rather than actual substantial gainful activity. (*Id.*). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of depression, anxiety, and bipolar disorder. (Tr. at 14-15, Finding No. 3). Claimant's medical records showed that she had a hiatal hernia and adrenal masses, but neither of these conditions caused more than a minimal limitation of work-related functioning. Accordingly, the ALJ determined that they were non-severe. (Tr. at 14). Claimant alleged disability related to her thyroid, but the evidence established that her hypothyroidism was stable. Therefore, it was also deemed a non-severe impairment. As the evidence did not establish that Claimant's COPD, hepatitis, and intermittent abuse of alcohol caused significant limitations of work-related functioning, they similarly were considered non-severe impairments. (Tr. at 14-15). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or medically equal any of the listed impairments. (Tr. at 15-17, Finding No. 4). Therefore, the ALJ determined

that Claimant had the RFC to:

> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can tolerate no fumes, dusts, odors, gases, and poor ventilation. She can perform simple, routine, repetitive tasks. She is not able to perform at production rate pace, but can perform goal-oriented work. She should not be required to make more than simple work-related decisions. She can have occasional interaction with supervisors and coworkers, but should not interact with the public. She can tolerate only few changes in the routine work setting (defined as occasional), and time off tasks can be accommodated by normal breaks.

(Tr. at 17-21, Finding No. 5). At the fourth step of the analysis, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 21, Finding No. 6). Consequently, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC under the fifth and final step to determine if she would be able to engage in substantial gainful activity. (Tr. at 21-22, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1962 and was defined as a younger individual on the alleged disability onset date; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the ALJ's disability determination because the Medical-Vocational Rules supported a finding of non-disability regardless of whether Claimant had transferable job skills. (Tr. at 21, Finding Nos. 7-9). Taking into account all of these factors and Claimant's RFC, and relying upon the opinion testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 21-22, Finding No. 10). At the heavy exertional level, Claimant could work as a material handler and general laborer; at the medium level, she could work as a hand packager and assembler; at the light level, she could be a price marker or house sitter; and at the sedentary level, Claimant could perform jobs such as a grader sorter or bench worker. (Tr. at 22). Therefore, the ALJ concluded that Claimant was not disabled as

defined in the Social Security Act from August 1, 2009 through the date of the decision. (Tr. at 23, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the Commissioner's decision is not supported by substantial evidence, because the ALJ failed to give proper weight to the opinions of Claimant's treating physician, Dr. Tammy Bannister, who stated on several occasions that Claimant was disabled. (ECF No. 11 at 4-8). Claimant contends that the ALJ disregarded Dr. Bannister's opinions in favor of opinions rendered by non-examining, non-treating consultants and then failed to give good reasons for deviating from the "treating source rule."

The Commissioner responds by pointing out that the treating source rule is not absolute. In this case, the ALJ acted well within her authority to reject Dr. Bannister's opinions because (1) the opinions were inconsistent with the treatment records; (2) Dr. Bannister is a primary care physician, not a specialist in psychology; and (3) Dr. Bannister only saw Claimant a few times for anxiety and depression. (ECF No. 12 at 9-10). According to the Commissioner, the ALJ gave appropriate weight to the medical source opinions, finding that the consultants' assessments were consistent with each other and with the other evidence. The consultants did not find Claimant to be disabled. Accordingly, the ALJ's decision was supported by substantial evidence.

## V.    **Relevant Medical Records**

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. Treatment Records

On September 28, 2009, Claimant presented to the office of Tammy Bannister, M.D., a physician at University Physicians & Surgeons in Barboursville, West Virginia. (Tr. at 277). Claimant had not seen Dr. Bannister for two years as Claimant had primarily been living out-of-town. She came in for a general check-up. Claimant reported doing well with medications, and she felt in good health. She continued to take Xanax for anxiety and reporting having had only two beers to drink in the prior three months. (*Id.*). Claimant's physical examination was normal, and her mood was documented as "appropriate." Her diagnoses included history of elevated liver enzymes; hypothyroidism, stable by examination; nicotine dependence; and depression/anxiety. Claimant was told to quit smoking, continue her Xanax, and return for a re-check in six months. (*Id.*).

Six months later, on March 29, 2010, Claimant returned to Dr. Bannister's office as instructed. (Tr. at 282-83). She complained of feeling tired. Claimant had recently moved back to the Barboursville area and was assisting with the care of her mother and grandchildren. She described recent emotional stress, stating that she felt angry, edgy, and irritable. Claimant also indicated that her symptoms of anxiety and depression came and went, but confirmed that she had no suicidal thoughts, still felt motivated, and had no decrease in the ability to concentrate. (Tr. at 282). Claimant's physical examination was entirely normal. (Tr. at 283). Her psychiatric examination revealed an unkempt appearance, but no demonstrated behavior abnormalities. She was cooperative, although her mood was noted to be anxious and irritable, and her affect was flat and tearful. (*Id.*). Claimant was diagnosed with anxiety, depression, hypothyroidism, and nicotine dependence. Her prescriptions were renewed, and she was given a sample of Lexapro to try. (Tr. at 284). Claimant was told to return in eight weeks, or sooner if her symptoms

worsened. (*Id.*).

Claimant followed-up on May 10, 2010, stating that she was "doing great" on Lexapro. (Tr. at 285). She described her mood as better; she was sleeping better and was not experiencing side effects from the medication. Both of Claimant's physical and psychiatric examinations reflected normal findings. (Tr. at 286).  She was instructed to continue with the medication and was given samples to last until her insurance would pick up the cost. Claimant was told to return for follow-up in six months. (*Id.*).

Claimant next saw Dr. Bannister on May 17, 2011. (Tr. at 294). Claimant reported feeling tired, having anxiety with palpitations, intermittent depression, poor sleep, and racing thoughts. She stated that she was having more issues with her mood. Claimant described sleeping to avoid interaction with others, and indicated that she had been unable to keep a job over the past two years due to conflicts, irritations, and an inability to cope with stressors. (*Id.*). Claimant's physical examination was normal; however, her psychiatric examination revealed an unkempt appearance, and an anxious mood and similar affect. (Tr. at 295). Dr. Bannister diagnosed Claimant with anxiety, hypothyroidism, and Bipolar I Disorder with rapid cycling. She gave Claimant samples of Zyprexa to try, instructing her to take the medication for 4-6 weeks and if her symptoms had not improved, Dr. Bannister would consider a referral to Prestera Centers for Mental Health ("Prestera"). (Tr. at 296).

On July 25, 2011, Claimant presented to Dr. Bannister's office for follow-up. (Tr. at 320-22). She had no new concerns and indicated that she was better since taking Depakote. Her anxiety and depression continued to be intermittent, but were relieved with medication, and her mood was more stable. Claimant's physical examination was normal; however, her psychiatric examination revealed disheveled and unkempt

appearance; anxious mood, and worried affect. Still, her thought processes and content were not impaired, and her demonstrated behavior was appropriate. (Tr. at 321). Claimant was diagnosed with anxiety, elevated AST level, solitary pulmonary nodule, acute bronchitis, hypothyroidism, nicotine dependence, Bipolar I Disorder with rapid cycling, and depression. (Tr. at 322). She was instructed to continue with medications. The office note from this visit was printed out and re-dated on August 11, 2010 and sent to Claimant. (Tr. at 325-27).

Claimant next saw Dr. Bannister on December 20, 2011. (Tr. at 387-90). Her chief complaints on this visit were "[follow-up] anxiety, bipolar and needs forms filled out." (Tr. at 388). Claimant reported that she was having increased anxiety and panic attacks, increased physical illnesses, and was losing weight. She was unable to drive due to panic attacks. She had difficulty staying on task and focusing. (*Id.*). Claimant's physical examination was normal; however, her psychiatric examination revealed an anxious mood, worried and irritable affect, and a tired, disheveled and unkempt appearance. (Tr. at 389). Claimant was diagnosed with anxiety, COPD, hypothyroidism, nicotine dependence, and Bipolar I Disorder. (*Id.*). She was instructed to continue with her medications. Dr. Bannister planned to refer Claimant to Prestera for management of her psychological issues.

The last office note from Dr. Bannister in the record is dated February 6, 2012. (Tr. at 384-86). On this date, Claimant primarily complained of symptoms related to her gallbladder. She did not appear to be in acute distress, although she did complain of right upper quadrant tenderness. (Tr. at 385). No psychiatric examination was performed, and Claimant expressed no particular concerns related to her mood. Claimant was instructed to make diet changes and an ultrasound of her gallbladder was ordered. (Tr. at 386). She

was also prescribed some medications related to her gastrointestinal issues.

### B. RFC Opinions

On July 11, 2011, Dr. Bannister responded to five written questions posed by the SSA. (Tr. at 323-24). She advised that Claimant's current diagnosis was "Bipolar D/O [disorder] II, Anxiety D/O, NOS [not otherwise specified]," and she was being treated with medications. (Tr. at 323). Dr. Bannister indicated that Claimant's diagnoses posed functional limitations that interfered with her ability to work by causing mood swings, poor focus outbursts, and an inability to "function regularly in ADL [activities of daily living]." (*Id.*). When asked if Claimant had been referred for mental health treatment, Dr. Bannister stated that Claimant had not, because she had no insurance at present and had declined a referral. However, she had received past psychiatric treatment. (*Id.*).

Two weeks later, Dr. Bannister completed a Routine Abstract Form for West Virginia Social Security Disability Determination Section ("WVDDS"). (Tr. at 309-11). On this form, she listed Claimant's mental health diagnoses as "Bipolar D/O, Anxiety, Depression." (Tr. at 309). Dr. Bannister described Claimant's work-related functional limitations caused by her psychological impairments as follows: "unable to adapt to change, details, socially anxious, poor self control, angry outbursts." (*Id.*). In addition, Dr. Bannister noted that Claimant isolated herself, avoided crowds and shopping, and tended to limit her self-care, sometimes going more than a week without a shower. She concluded by stating that Claimant had a long history of mental health issues with varying degrees of impairment, although at present, her condition was worsening due to her life situation, age, and lack of care. (*Id.*).

Dr. Bannister performed a mental status examination as part of the abstract. (Tr. at 310). Claimant was oriented with normal speech. Her mood was anxious and irritable,

and her affect was labile. She had no delusions, hallucinations, suicidal or homicidal thoughts, but her thought content was preoccupied and phobic. Claimant's insight, judgment, concentration, task persistence, and pace were all moderately deficient; her immediate and recent memory was mildly deficient, and her social functioning was severely deficient. (*Id.*). Claimant was not administered any psychological testing. (Tr. at 311).

On August 11, 2011, Dr. Bannister wrote a letter "To whom it may concern" regarding Claimant's psychiatric condition and ability to work. (Tr. at 328). In the letter, Dr. Bannister stated that Claimant had been treated in the past for her psychiatric issues, but currently was not being treated by a psychiatrist "due to lack of insurance and poor availability of community resources." (*Id.*). She indicated that Claimant had moderate success with therapy and medications, but her psychiatric history was complicated by alcohol abuse. At the present, Dr. Bannister did not believe that Claimant could be gainfully employed due to the symptoms of her psychiatric conditions, which included agitation, aggression, impulsivity, outbursts, poor interpersonal skills, and poor motivation. She opined that even with the use of medications, Claimant's symptoms prevented employment. (*Id.*).

The WVDDS arranged for Claimant to be evaluated on September 3, 2011 by Emily E. Wilson, M.A., a licensed psychologist. (Tr. at 331-36). Ms. Wilson conducted a clinical interview and mental status examination. Claimant identified herself with a valid Kentucky driver's license. She reported that she currently lived with her mother in West Virginia and was being supported by her mother, because she had not been able to hold down a job for the past couple of years. Claimant explained that she became combative and frustrated, and she had a hard time "figur[ing] out things." (Tr. at 331). Claimant

stated that she suffered from anxiety that started several years earlier. She worried about her youngest child and money. She described herself as a perfectionist and reported having severe panic attacks that would interfere with her driving, causing her to pull off of the road. To calm herself down, Claimant liked to go to the cemetery to think. (Tr. at 332). Claimant also reported having daily symptoms of depression, which had been present all of her life. She recalled that at age 9, she began to get into trouble. Her IQ was tested and scored at 127, but she believed she had ADHD. Claimant stated that she started drinking alcohol at age 12 and "always self-medicated." (*Id.*). According to Claimant, her psychiatric symptoms caused her to go without sleep for several days at a time and made her neglect self-care, sometimes resulting in her failing to shower for two or three weeks. (Tr.at 333). Claimant listed a myriad of current symptoms, indicating that medications helped to some degree, although she still had difficulty dealing with people and could not control her behavior around others. Her mental health history included two hospitalizations in the 1990's and counseling with a local psychiatrist several years earlier. Claimant also took psychotropic medications. (*Id.*). Claimant's substance abuse history included taking a variety of street drugs in her teenage years and heavy drinking, although she no longer used illegal drugs and drank about one bottle of alcohol one time per month. (Tr. at 334). Claimant did not appear intoxicated or smell of alcohol at the interview. Claimant's educational history included graduation from high school, good grades, normal classes, and involvement in activities. However, she did have discipline problems. (*Id.*).

Claimant told Ms. Wilson that she was born in North Carolina, but was raised in Cabell County, West Virginia. She had been married and divorced twice and had two daughters, both of whom were in their late twenties. (Tr. at 334) Regarding her daily

activities, Claimant stated that she performed most of her self-care and hygiene independently. (*Id.*). She cleaned some around the house, drove her grandchildren to school, and picked them up in the afternoon. She no longer cooked, did not have any hobbies, and did not attend social gatherings. Claimant was able to manage her own finances.

On mental status examination, Ms. Wilson noted that Claimant had average grooming and hygiene. (Tr. at 335). She was cooperative during the interview and maintained fair eye contact. Claimant was oriented, with relevant and coherent speech. Her mood was appropriate to the situation, and her affect was noted to be broad as evidenced by the explanation of her problems. Claimant's insight and judgment were gauged to be within the average range. Her remote and immediate memory was normal, but her recent memory was moderately deficient. Persistence, pace, and concentration all appeared to be within the normal range. (*Id.*). Ms. Wilson diagnosed Claimant with Bipolar Disorder, NOS; Panic Disorder without Agoraphobia; Alcohol-Related Disorder, NOS, rule-out alcohol dependence. Ms. Wilson felt that Claimant had a fair prognosis.

On September 16, 2011, Debra Lilly, Ph.D. provided a Psychiatric Review Technique and Mental RFC opinion based upon a review of Claimant's file and Ms. Wilson's evaluation. (Tr. at 338-55). Dr. Lilly diagnosed Claimant with Bipolar Disorder, NOS, versus Substance-induced Mood Disorder and Panic Disorder versus Anxiety Disorder, NOS versus substance-induced anxiety. (Tr. at 341, 343). Dr. Lilly concluded that Claimant did not meet any of the mental impairment listings as she was only mildly limited in her activities of daily living; moderately limited in maintaining social functioning, concentration, persistence, or pace; and suffered no episodes of decompensation of extended duration. (Tr. at 348). Claimant had no evidence to satisfy

the paragraph "C" criteria. (Tr. at 349). Dr. Lilly commented that she had read Dr. Bannister's records and letters, but did not put much weight in the disability opinions because Dr. Bannister "[did] not address [the] influence of chronic alcoholism on ratings and the lack of her mental status information or the claimant's history to support her claims." (Tr. at 350). Dr. Lilly pointed out that Dr. Bannister's letter and disability statements made claims that were not supported by the treatment records. For instance, Dr. Bannister stated that Claimant had severe social problems, yet these were not evident in the treatment notes, and certainly were not reflected in the report prepared by Ms. Wilson. (*Id.*). Dr. Lilly also questioned the reliability of Claimant's allegations. She discussed Claimant's assertion of having severe panic attacks when driving, yet Claimant continued to drive herself to appointments. Furthermore, Claimant alleged that she had a history of aggression in the past, yet Claimant had no legal history, suggesting that her aggression was not a severe problem. (*Id.*).

Regarding Claimant's mental RFC, Dr. Lilly opined that Claimant was "moderately limited" in her abilities to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended period of time; interact appropriately with the general public; and respond appropriately to changes in the work setting. (Tr. at 352-53). Otherwise, Dr. Lilly opined that Claimant was "not significantly limited" with respect to any other functional capacity relating to understanding and memory, sustained concentration and persistence, social interaction, or adaptation. (*Id.*). In summary, Dr. Lilly concluded that Claimant "retains the ability to learn, recall, and perform simple, one and two step commands that have limited requirements of interacting with the general public." (Tr. at 354). Once again, Dr. Lilly emphasized that the evidence of record and Ms. Wilson's examination report simply did

not substantiate the severe limitations suggested by Dr. Bannister. Dr. Lilly believed that Dr. Bannister's opinions were flawed in that she failed to consider the role Claimant's chronic alcoholism played in her symptoms. Dr. Lilly's assessment was affirmed as written by a second agency consultant, Bob Marinelli, Ed.D., on October 25, 2011, after he reviewed all pertinent evidence in Claimant's file. (Tr. at 361).

On December 20, 2011, Dr. Bannister answered three written questions posed by Claimant's attorney and completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) form. (Tr. at 367-71). In answer to the written questions, Dr. Bannister explained that Claimant's subjective complaints were due to her poorly controlled anxiety and Bipolar Disorder, as well as her medications, which caused fatigue and sleepiness. (Tr. at 367). She opined that Claimant could not engage in employment on a consistent basis due to her psychiatric disorders. In addition, Claimant's COPD would further limit her capacity to work. (Tr. at 368). Dr. Bannister rated Claimant's ability to understand and remember simple instructions as moderately limited; her ability to carry out simple instructions and make judgments on simple work-related decisions markedly limited; and her ability to do anything complex extremely limited. (Tr. at 369). Additionally, Dr. Bannister felt Claimant was markedly limited in her ability to interact appropriately with co-workers, supervisors, and the general public, and extremely limited in the ability to respond properly to changes in the work setting. (Tr. at 370). Dr. Bannister cited to Claimant's severe panic attacks, anxiety, and inappropriate response to stressful stimuli as grounds for these opinions. (Tr. at 369-70). She indicated that Claimant had previously abused alcohol, but was status post-rehabilitation treatment and was now abstinent. Nonetheless, Claimant continued to have problems. Dr. Bannister believed that Claimant used alcohol to self-medicate her anxiety and mood disorder,

rather than causing the anxiety and mood disorder by abusing alcohol. (Tr. at 370).

## VI.  **Scope of Review**

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VII.  **Analysis**

As previously stated, Claimant's sole challenge to the Commissioner's disability determination involves the weight given by the ALJ to the medical source opinions.

Specifically, Claimant criticizes the ALJ's decision not to give controlling, or even great, weight to the opinions of Dr. Bannister, Claimant's treating physician, and instead to give more weight to the opinions of the agency consultants.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6),

and must explain the reasons for the weight given to the opinions.[1] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4 (S.S.A. 1996). Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

2. What an individual's RFC is;

3. Whether an individual's RFC prevents him or her from doing past relevant work;

---

[1] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at *2.  "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions. *See Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). A minimal level of articulation of the ALJ's assessment of the evidence is "essential for meaningful appellate review," given that "when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d. 700, 705 (3rd Cir. 1981)).

Here, the ALJ complied with the applicable regulations by considering all of the medical source opinions, including those of Dr. Bannister. (Tr. at 20-21). Starting first with Dr. Bannister's physical RFC assessment, the ALJ reviewed the limitations imposed by Dr. Bannister and concluded that they were entitled to "little weight" on the basis that

they were not consistent with the record as a whole. In addition, the ALJ noted that Dr. Bannister had only seen Claimant four times between September 2009 and September 2011, and Dr. Bannister's medical specialty was family medicine. (Tr. at 20). Turning to Dr. Bannister's opinions regarding Claimant's mental impairments, the ALJ recounted the specific functional deficits identified by Dr. Bannister and afforded them little weight "as they are not consistent with the record as a whole and the opinion does not relate to D. Bannister's specialty." (Tr. at 20). Moreover, the ALJ emphasized that Dr. Bannister only saw Claimant a limited number of times.

Next, the ALJ discussed the examination conducted by agency consultant, Emily Wilson. (Tr. at 21). The ALJ noted that Claimant's mental status examination reflected an appropriate mood, broad affect, intact concentration, persistence, and pace. Claimant was found to be cooperative, interacted appropriately and gave adequate responses with relevant and coherent speech. Ms. Wilson evaluated Claimant's judgment to be average, her immediate memory to be normal, and her recent memory to be only moderately impaired. The ALJ gave great weight to the examination findings because they were the results of a comprehensive assessment, and Ms. Wilson specialized in psychology, unlike Dr. Bannister, who was a family doctor. (*Id.*).

Finally, the ALJ considered the opinions of Dr. Lilly, which were affirmed by Dr. Marinelli. Although these agency consultants did not examine Claimant, the ALJ found significance in their knowledge of the Social Security program requirements and their review of Claimant's file prior to rendering their opinions. The ALJ noted that both of these medical sources were familiar with all of the evidence in Claimant's record and that evidence provided grounds for their conclusions. (Tr. at 21). She also stressed that these consultants were psychological specialists. Therefore, the ALJ gave great weight to the

opinions of Drs. Lilly and Marinelli. (*Id.*).

The ALJ's discussion of the opinions and the reasons given for either discounting or crediting the opinions demonstrates that the ALJ followed the mandates of the regulations and rulings. The ALJ clearly examined all of the opinions for consistency and supportability with other evidence in the record. She specifically found that Dr. Bannister's RFC opinions were extreme when compared to her treatment records and the examination findings of Dr. Wilson. The ALJ plainly considered the other factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), as well. For instance, she discounted the value of Dr. Bannister's opinions regarding Claimant's mental impairments on the basis that Dr. Bannister was not a specialist in psychology, while Drs. Lilly and Marinelli and Ms. Wilson did specialize in that field. The ALJ also took into account the limited number of visits that Claimant had with Dr. Bannister. Other factors bearing on the weight of the opinions included (1) access to and familiarity with the Claimant's disability file, which Drs. Lilly and Marinelli had, but Dr. Bannister did not have, and (2) knowledge of the requirements of the Social Security program. Dr. Lilly, Dr. Marinelli, and Ms. Wilson all were consultants for the agency and consequently were knowledgeable of the Social Security disability terminology and standards. Nothing in the record indicated that Dr. Bannister had similar exposure to the Social Security disability system. Therefore, the Court **FINDS** that the ALJ properly weighed the medical source opinions using the procedures and applying the factors set forth in the applicable regulations and rulings.

Claimant is also critical of what she perceives to be a failure by the ALJ to "give good reasons" for rejecting Dr. Bannister's opinions. Citing to *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000), a decision by the Fifth Circuit Court of Appeals, Claimant

contends that the ALJ committed reversible error by not supplying details in the written decision of her analysis of the factors set forth in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c). Claimant is correct that the ALJ did not systematically relate her thought processes on each factor. Instead, she summarized Claimant's treatment records, evaluations, and assessments, discussed Claimant's daily activities and credibility, and assigned weight to the various medical source opinions, providing a succinct explanation for the weight given. Nevertheless, the Court does not find the absence of a detailed analysis of each factor to constitute reversible error. Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon the various factors, the regulations do not explicitly require the ALJ to regurgitate in the written decision every facet of the analysis. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2).

SSR 96-2p provides additional clarification of the ALJ's responsibility to give good reasons, stating:

> When the determination or decision: is not fully favorable, e.g., is a denial ... the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

1996 WL 374188, at *5 (S.S.A. 1996). Cases discussing this duty have taken slightly different approaches on what and how much the ALJ must include in the written opinion to constitute an adequate explanation. Some courts require the ALJ to "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Newbury v. Astrue,* 321 F.App'x 16, 17 (2d Cir. 2000) (quoting *Halloran v. Barnhart,* 362 F.3d 28, 33

(2d Cir. 2004)); *see also Sharfarz v. Bowen,* 825 F.2d 278, 279 (11th Cir. 1987) (Courts must state "with particularity" the weight given to different medical source opinions and the reasons for the weights given.) Other courts, such as the Fifth Circuit Court of Appeals, only insist on a detailed analysis of the factors and weight given to a treating physician's opinion when there is an absence of "reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist." *Rollins v. Astrue,* 464 F.App'x 353, 358 (5th Cir. 2012) (quoting *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000)). Finally, some courts take the position that while the ALJ must consider the factors, the ALJ is not required to discuss each one in his or her opinion as long as a subsequent reviewer is able to understand the weight given to the opinions and the reasons for that weight. *Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007); *see also Green v. Astrue,* 588 F. Supp. 2d 147, 155 (D. Mass. 2008). This Court has held that "while the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014). "Simply stated, the adequacy of the written discussion is measured by its clarity to subsequent reviewers." *Young v. Colvin*, No. 3:13-cv-20719, 2014 WL 4546958, at *13 (S.D.W.Va. Sept. 12, 2014); *Tucker v. Astrue*, 897 F. Supp. 2d 448, 468 (S.D.W.Va. 2012); *see also Jividen v. Colvin*, No. 3:12-04698, 2014 WL 1333196, at *1, *21 (S.D.W.Va. Mar. 31, 2014) (adopting PF&R wherein magistrate judge recognized that ALJ need not explicitly mention each factor contained in 20 C.F.R. § 404.1527(c) when evaluating treating physician's opinion).

Applying this Court's "clarity" standard, the undersigned **FINDS** that the ALJ

fulfilled her duty to give good reasons for rejecting Dr. Bannister's opinions. The ALJ made it crystal clear that Dr. Bannister's limited exposure to Claimant (only a handful of visits in two years) and her lack of training and expertise in psychology were two significant factors that weighed against the reliability of her opinions, which the ALJ considered to be extreme when viewed in relation to the objective evidence. In addition, the discrepancy between the severe limitations delineated by Dr. Bannister in her RFC assessment and the relatively benign findings contained in Dr. Bannister's office records documenting Claimant's visits was another substantial ground for rejecting her opinions. Obviously, the ALJ considered the consistency and supportability of Dr. Bannister's functional ratings. Lastly, the ALJ communicated the value she placed on the medical source having knowledge of the Claimant's entire file before rendering an opinion. Certainly, the ALJ found Claimant's credibility to be questionable. As such, the more objective information that was made available to the medical expert, the better the odds that the expert would be in a position to generate an opinion that truly reflected Claimant's capabilities and limitations. Dr. Bannister did not have access to critical information in Claimant's file; such as, Ms. Wilson's psychological evaluation of Claimant, or Claimant's Function Reports, and nothing in the record suggests that Dr. Bannister was aware of the requirements associated with a disability finding under the Social Security Act. These were other "good reasons" given by the ALJ for deciding that the opinions of the agency consultants carried more weight than those of Dr. Bannister.

Having thoroughly reviewed the record, the Court **FINDS** that substantial evidence supports the ALJ's decision. Dr. Bannister only saw Claimant five times in two years and may not have been given all of the information needed to provide an accurate account of Claimant's limitations Indeed, Dr. Bannister, who knew that Claimant had a

history of alcohol abuse, based her RFC opinions, in part, on the presumption that Claimant was abstaining from alcohol use. For that reason, Dr. Bannister expressly eliminated alcoholism as a cause or contributor to Claimant's limitations. Indeed, in one of her RFC statements, Dr. Bannister concluded that Claimant's psychiatric illnesses caused her to drink, rather than the opposite—that her chronic alcohol abuse produced her psychological symptoms. (Tr. at 370) Dr. Bannister denied that alcohol played a role in Claimant's limitations, stating that Claimant "previously had alcohol abuse, and is [status post] rehab treatment and at this time, she is abstinent and issues remain as above [interactions with others impaired, panic episodes, decision-making impaired]. I believe her alcoholism was related to self-medicating to control anxiety, mood." (*Id.*). Contrary to what Claimant told Dr. Bannister, however, Claimant admitted to Emily Wilson that she still had a problem with alcohol abuse, reporting that in the past six to eight months, she had reduced her alcohol intake to drinking one time per month. Nonetheless, on those occasions, she purchased "a bottle," which she would then bring home and "drink the whole thing." (Tr. at 334). According to Dr. Lilly, the objective findings in Claimant's treatment record did not correspond with the severe disability ratings given by Dr. Bannister. Dr. Lilly felt one inherent weakness in Dr. Bannister's assessment was her failure to address the influence of Claimant's chronic alcoholism. (Tr. at 350). In fact, Dr. Lilly suspected that Claimant's psychiatric conditions might have been alcohol-induced. No doubt, Dr. Bannister was at a disadvantage in that she did not have a correct picture of Claimant's ongoing alcohol intake, but the end result is that her opinions were based upon a fundamental misunderstanding of a significant fact, which seriously undermines the strength, and thus the value, of those opinions.

Dr. Bannister's treatment notes confirm that Claimant complained of anxiety and

depression. However, Claimant also stated that her symptoms were controlled well on medication. (Tr. at 277, 285, 320). She did not receive counseling, nor was she hospitalized for acute psychiatric illness. Claimant was able to care for herself, her grandchildren, and her mother. (Tr. at 282). The ALJ considered the record as a whole, and she included restrictions in the RFC finding to fully account for the mental limitations found by Dr. Lilly and Dr. Marinelli. As those were the only limitations established by the record, the ALJ followed the proper procedures and issued a determination that is supported by substantial evidence.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  March 10, 2015

Cheryl A. Eifert
United States Magistrate Judge